## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                        )
                                        )
**SHERRY LYNN REID,**                   )
                                        )
      **Plaintiff,**    )
                                        )
      **v.**           )
                                        )
                                        )   **Civil Action No. 19-10663-DJC**
**ANDREW SAUL,**                        )
**Commissioner of Social Security,**    )
                                        )
      **Defendant.**    )
                                        )
_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                    **September 28, 2020**

## I.    Introduction

      Plaintiff Sherry Lynn Reid ("Reid") filed a claim for social security disability insurance benefits ("SSDI") and supplemental security income ("SSI") with the Social Security Administration ("SSA") on January 19, 2017. R. 174.[1] Pursuant to the procedures set forth in the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), Reid brings this action for judicial review of the final decision of Andrew Saul, the Commissioner of the SSA ("the Commissioner"),[2] issued by an Administrative Law Judge ("ALJ") denying her claims. D. 1. Reid moves to reverse the ALJ's decision denying her SSDI and SSI benefits, D. 16, and the Commissioner moves to affirm

---

[1] "R" refers to citations to the Administrative Record, filed at D. 13.

[2] The current Commissioner of the SSA, Andrew Saul, is substituted here. Fed. R. Civ. P. 25(d).

the ALJ's decision, D. 18.  For the reasons stated below, the Court DENIES Reid's motion to reverse and ALLOWS the Commissioner's motion to affirm.

## II.      Factual Background

On January 19, 2017, Reid applied for disability benefits alleging disability due to a torn labrum in her left hip, lumbar degenerative disc disease, ovarian cysts, lumbar radiculopathy, hip pain, deep vein thrombosis ("DVT"), depression, anxiety, asthma and chronic otitis media.  R. 164; R. 178.  On February 6, 2017, Reid ceased working as a payroll office worker at a fast food restaurant at the age of forty-two.  R. 178-79.

## III.     Procedural Background

The SSA denied Reid's application for benefits in its initial review on August 8, 2017, R. 104, and again upon reconsideration on September 20, 2017.  R. 109.  On October 2, 2017, Reid filed a timely request for a hearing before an ALJ.  R. 112.  The ALJ held a hearing on May 14, 2018.  R. 36.  On July 25, 2018, he ALJ determined that Reid did not have a disability within the meaning of the Social Security Act and denied Reid's claims.  R. 10-25.  The Appeals Council denied Reid's request for review on February 13, 2019.  R. 1.  Accordingly, the ALJ's decision is the Commissioner's final decision.  R. 1.  Reid has now initiated this action.  D. 1.

## IV.      Discussion

### A.      <u>Legal Standards</u>

#### 1.      *Entitlement to Disability Benefits and Supplemental Security Income*

A claimant's entitlement to SSDI and SSI turns in part on whether she has a "disability," defined in the Social Security context as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

than [twelve] months." 20 C.F.R. § 416.905(a). The inability must be severe, rendering the claimant unable to do his or her "past relevant work or any other substantial gainful work that exists in the national economy." Id.

The Commissioner must follow a five-step process to determine whether an individual is disabled for Social Security purposes. 20 C.F.R. § 404.1520(a)(1). The determination may be concluded at any step along the process. 20 C.F.R. § 404.1520(a)(4). First, if the applicant is engaged in substantial gainful work activity, then the application is denied. 20 C.F.R. § 404.1520(a)(4)(i). Second, if the applicant does not have, or has not had within the relevant period, a severe impairment or combination of impairments, then the application is denied. 20 C.F.R. § 404.1520(a)(4)(ii). Third, if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted. 20 C.F.R. § 404.1520(a)(4)(iii). Fourth, if the applicant's residual functional capacity ("RFC") is such that she can still perform past relevant work, then the application is denied. 20 C.F.R. § 404.1520(a)(4)(iv). Fifth and finally, if the applicant given her RFC, education, work experience and age is unable to do any other work, the application is granted. 20 C.F.R. § 404.1520(a)(4)(v).

2.    *Standard of Review*

This Court has the power to affirm, modify or reverse a decision of the Commissioner upon review of the pleadings and record. 42 U.S.C. § 405(g). Such review, however, is "limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (citing Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996)). The ALJ's findings of fact are conclusive when supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as

adequate to support [the Commissioner's] conclusion." Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981) (citations omitted).

The Commissioner's factual findings, however, "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen, 172 F.3d at 35 (citations omitted).  Thus, if the claimant demonstrates that the ALJ made a legal or factual error, Manso-Pizarro, 76 F.3d at 16, "the court may reverse or remand such decision to consider new, material evidence or to apply the correct legal standard." Martinez-Lopez v. Colvin, 54 F. Supp. 3d 122, 129 (D. Mass. 2014) (citation and internal quotations omitted); see 42 U.S.C. § 405(g).

## B.   Before the ALJ

### 1.   Medical History Presented to the ALJ

#### a)   Degenerative Disc Disease and Chronic Radicular Lumbar Pain

Dr. Matthew M. Phillips performed two lumbar spine surgeries on Reid in or about 2013 and 2014.  R. 347.  Reid "did gain benefit from the surgeries," R. 431, and the pain subsided but she was left with chronic numbness in her left foot and chronic lower back pain.  R. 347.

On October 20, 2016, Reid saw nurse practitioner, Marie T. Aguilar ("Aguilar") for increased back pain associated with her left posterior leg and numbness to her sole.  R. 347. Aguilar noted that Reid reported that her symptoms were "constant and severe."  Id.  Medical records reflected that Reid's pain was worse when lying flat in bed and when sitting or standing too long, but  was better at times when she was moving around.  Id.  Aguilar noted that pain management and transcutaneous electrical nerve stimulation ("TENS") treatments were "no help lately."  Id.  Reid also reported having left hip pain and had an orthopedic evaluation pending.  Id.

On May 18, 2017, Reid met with physician assistant, Aaron Novy ("Novy"). R. 351. Novy noted that Reid's back pain was worsening and that she had pain in her left leg and her posterior thigh to calf. R. 351. Novy ordered a lumbar spine MRI with contrast and an EMG. Id. Reid underwent these tests. R. 330-331, 351-352. At a follow-up appointment, Novy noted that Reid's MRI showed "stable L5/S1 with no disc herniation" and a negative EMG LLE, but that Reid still had pain in her back and leg. R. 352. Novy recommended "bilateral L5/S1 facet injections" and physical therapy. R. 352.

>b)     Deep Vein Thrombosis ("DVT") and Pulmonary Embolism

In October 2014, Reid was diagnosed with DVT in her lower left leg and prescribed a blood thinner. See R. 354; R. 427. Reid complained of "pain located in the lower back and hip [] and left leg" that began years ago due to "spinal deterioration resulting in left L5 hemilaminectomy." R. 354. In August 2015, Reid had a pulmonary embolism and as a result she had "a chest tube placed for collapsed lung at that time, but [has had] no further recurrence," but remained on medication. R. 78.

In July 2017, her primary care physician ("PCP"), Dr. Marivyl J. Laxer noted that Reid did not use oxygen for her DVT, did not have any symptoms of shortness of breath nor wheezing, and that she had not been hospitalized or seen in the emergency room in the past two years related to her DVT. R. 427.

>c)     Left Hip Internal Derangement

Reid met with Dr. Michael J. Langworthy on October 26, 2016. R. 334. Reid complained of pain when she walked, night pain and difficulty performing everyday activities. Id. Reid had tried over-the-counter pain medication for relief, but had not tried physical therapy or injections. Id. Dr. Langworthy reported that Reid previously had an MRI showing a left "anterior superior

labral tear" and "left gluteal minimus tendinopathy" with a partial thickness tear.  Id.  Dr. Langworthy also noted that Reid's sensation was intact, she had good muscle bulk and her reflexes were intact.  R. 337.  Reid's range of motion was between negative two to full extension of 105 degrees of flexion.  Id.  Reid, however, still had a painful gait so Dr. Langworthy prescribed physical therapy.  Id.  Reid followed-up with Dr. Langworthy in December 2016, after receiving MRI results that indicated gluteal tendinopathy.  Id.  Dr. Langworthy injected Reid's left hip with a mild steroid to relieve the pain and noted that Reid would follow up in one month.  Id.

On February 23, 2017, Reid underwent hip debridement surgery for her gluteal tendinopathy.  R. 392-393.  Two weeks later, Reid met with physician assistant, Taylor Pettit ("Pettit").  R. 338.  Pettit reported that Reid's pain was improving and that she was "ambulating well unassisted."  Id.  Pettit prescribed physical therapy for Reid.  Id.

On March 13, 2017, Reid met with physician assistant, Gregory W. Pierce ("Pierce"), for pain management.  R. 373.  Reid reported "low back pain with radiation to the posterior aspect of the left lower extremity and foot."  Id.  Reid also rated her low back and left hip pain as a seven out of ten.  Id.  Pierce noted that Reid continues to take Percocet and Zanaflex for pain management, and denies having side effects.  Id.  Pierce recommended that Reid continue her current drug regiment with an additional prescription of Pamelor to help with neuropathic pain.  R. 375.  Pierce noted that Reid "continues to derive the benefits of pain reduction with chronic opiate therapy" with no evidence of harm.  R. 374.

On April 7, 2017, Reid reported to physician assistant, Jennifer Lussier ("Lussier") that her level of pain had improved with her current pain management regiment.  R. 378.  Reid also reported that her new medication Pamelor caused "sedation" after taking the morning dose.  R. 376.  As a

result, Reid started taking only the evening dose of Pamelor.  Id.  Several months later, Reid reported that she stopped taking Pamelor because she experienced issues with her vision.  R. 379.

In June 2017, Reid met with Pettit again.  R. 339.  Pettit noted that Reid experienced "pain more in her back and buttock," id, and that her gait was normal.  R. 340.  Pettit believed that Reid's continued pain was related to her back, not her hip surgery.  Id.

### d)     Depression, Bipolar Disorder and Anxiety

On February 5, 2016, Reid saw Dr. Uma Kolli because she has been irritable and crying "for no reason."  R. 282.  Reid stated that she felt anxious, had hot flashes and kept putting blankets on and off, had abdominal pain that felt stuck in her epigastric region and that she feels nauseous all the time.  Id.  Dr. Kolli noted that Reid was "anxious" and "crying all through the encounter." Id.  Dr. Kolli prescribed Reid a short trial of Klonopin.  R. 283.

In July 2017, Reid saw Dr. Laxer because she was still experiencing anxiety and depression.  R. 511.  Dr. Laxer noted that Reid had "progressive depression due to multiple stressors in life," felt shaky and tremulous, a lack of appetite, loss of interest, but no suicidal thoughts.  Id.  Dr. Laxer also noted that Reid had been out of work for five months.  Id.  Dr. Laxer prescribed Reid a higher dose of Citalopram for her anxiety symptoms and referred her to a psychologist.  R. 515.

Reid began treatment with psychiatric nurse practitioner, Amanda Raposo ("Raposo") in March 2018 for her anxiety and depression.  R. 521.  During a March 6, 2018 evaluation, Reid presented as glum, sad looking, unhappy, but attentive.  R. 527.  Raposo noted that Reid had signs of anxiety and that Reid's speech was pressured but with normal volume.  Id.  Reid had no difficulty naming objects or repeating phrases, her affect was appropriate, full range and congruent with her mood.  Id.  Reid did not have any hallucinations, suicidal or homicidal ideations,

delusions, bizarre behaviors, or indications of psychotic processes; her associations were intact, thinking logical and thought content appeared appropriate.  Id.   Raposo noted that Reid's short- and long-term memory, ability to abstract and do arithmetic calculations and judgment were intact. Id.   Raposo diagnosed Reid with bipolar disorder, depression and anxiety, R. 530-531, and prescribed Reid Vraylar, a mood stabilizer and Remeron.  R. 534.  Raposo also instructed Reid to taper off her prescription of Celexa and stop her usage of Promethazine syrup, Augmentin, Ropinirole and Trazodone.  Id.

Reid followed up with Raposo on March 27, 2018.  R. 536.  Reid reported continued chronic depressive symptoms including, angry episodes, difficulty concentrating and excessive fatigue.  Id.  Reid also noted that her anxiety symptoms had not improved and that she continued to have feelings of restlessness and fatigue.  Id.  Raposo prescribed Latuda for Reid's bipolar diagnosis and Inderal for her anxiety and instructed her to taper off the Vraylar.  R. 541.

Reid met with Raposo a month later and reported that she saw some improvements in her symptoms.  R. 543.  Reid noted that she still experienced chronic depressive symptoms but noticed improvements including:  worrying less, a decrease in the frequency and intensity of her depressive moods, easier time concentrating, a decrease in crying episodes, decrease in excessive fatigue, improved sleep and decrease in racing thoughts.  Id.  Reid still experienced symptoms of anxiety, but her panic attacks were less frequent and less severe.  Id.  Reid reported not having any side effects to her medication but noted that she experienced sleepiness after taking Propranolol. R. 544.  Reid felt that the medications Raposo prescribed were not therapeutic in addressing all of her symptoms, and she reported that she was open to making changes to her current regimen. Id.

e)   <u>Cervical Spine Degenerative Disc Disease and Spondylosis</u>

In July 2017, physician assistant Gregory William Pierce ("Pierce") noted that Reid had increased cervical spine pain "with radiation to bilateral upper extremities." R. 382. Pierce noted that the x-ray of her cervical spine showed "[m]inimal pathology" and that Reid was stable on her current medication. <u>Id.</u>; R. 434.

f)   <u>Chronic Otitis Media[3]</u>

On May 18, 2017, physician assistant Kathryn A. Titcomb ("Titcomb") noted Reid had met with her PCP earlier in the month because she had pain and a blocked sensation in her left ear. R. 411. Reid's PCP diagnosed her with "acute sinusitis, upper respiratory infection" and left acute otitis media. <u>Id.</u> Reid's PCP prescribed her antibiotics and prednisone and gave her an inhaler and nasal spray. <u>Id.</u> During a follow-up visit, Reid informed her PCP that her ear was getting worse. <u>Id.</u> Her PCP "said that the sinus infection and upper respiratory infection had cleared," but Reid needed additional follow up because of her ear infection. <u>Id.</u> Dr. Ilana L. Feinerman ("Feinerman") recommended surgical intervention for her ear pain. <u>Id.</u>

On May 23, 2017, Reid met with speech and language pathologist, Kelly Coucci ("Coucci"). R. 315. Coucci reported that Reid was scheduled for a tube placement in her left ear, and assessment of the lesion on her right vocal fold. <u>Id.</u> Reid noted having a chronic cough, dry throat and a sensation that there was something stuck in her throat. <u>Id.</u> The next day, Dr. Feinerman performed a myringotomy, an incision of the eardrum with tube insertion, on Reid's ear. R. 320-322.

---

[3] Otitis media is an inflammation or infection located in the middle ear. <u>Otitis Media</u>, John Hopkins Medicine, <u>https://www.hopkinsmedicine.org/health/conditions-and-diseases/otitis-media</u> (last visited September 28, 2020).

g)      Ovarian Cysts

Dr. Greg Angell has treated Reid for back pain associated with ovarian cysts on her left side since at least October 2014.  See R. 346.  On June 29, 2017, Dr. Angel noted that he would book an "operative pelviscopy to remove [Reid's] [left] ovary" and that it would be the third surgery on this side.  R. 343.

h)      Asthma

Dr. Laxer noted in March 2017 that Reid did not have any distress based on her asthma and that she only occasionally used an inhaler.  R. 297.  Dr. Laxer prescribed two puffs of an albuterol sulfate every four hours as needed for wheezing or shortness of breath.  R. 297, 306. That same month, nurse practitioner Shannon Avery-Desmarais ("Avery-Desmarais") noted that Reid's current medical treatment for her asthma is effective and she should "continue [her] present plan and medications."  R. 304.

2.    *Physical RFC Findings*

a)      Dr. McGan's Physical RFC Assessment

On July 31, 2017, state physician Dr. Robert B. McGan examined Reid's medical records and made a physical Residual Functional Capacity ("RFC") assessment.  R. 77-79.  As background, Dr. McGan noted Reid's previous surgeries, most notably her two spine surgeries, R. 78, and an October 2016 follow-up appointment noting "bilateral moderate NF narrowing L 4-5 and radiculopathy" in her fourth and fifth left toes. R. 78.  Dr. McGan considered, among other things, EMG performed in June 2017 and a physical exam performed in July 2017 showing "decreased ROM, TTP over L/S area [and] SLR antalgic gait."  Id.  Dr. McGan addressed Reid's left gluteal tendon debridement surgery citing that she was "ambulating well unassisted" following the surgery.  Id.  Dr. McGan recognized that Reid has a history of DVT and she is prescribed

Coumadin for her symptoms. Id.  In August 2015, Reid experienced a pulmonary embolism and as a result she had "a chest tube placed for collapsed lung at that time, but no further recurrence, but still on med[ications]." Id.  Dr. McGan discussed Reid's "sinisitus" and specified that she had a "blocked L TM and had a tube placed [in her ear]." Id.  Dr. McGan also noted that Reid had asthma citing that she had "no ER or hosp[ital] visits for this [condition]." Id.

Dr. McGan concluded that Reid has exertional limitations, noting that Reid can occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand and/ or walk for four hours with normal breaks, and sit for about six hours in an eight-hour workday with normal breaks.  R. 77.  Dr. McGan, however, noted that Reid she does have limitations in her ability to push and pull in her lower left extremities.  Id.

As to Reid's postural limitations, he concluded that she could occasionally climb stairs and ramps, ladders, or scaffolds and occasionally balance, stoop, kneel, crouch and crawl,  R. 78, but had no manipulative, visual or communicative limitations.  Id.  As to environmental limitations, she had limitations as she should avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, dusts, gas, poor ventilation, and hazards, such as machinery and heights.  R. 78-79.

#### b)  Dr. Truong's Physical RFC Assessment

On September 13, 2017, state physician Dr. Alice Truong reviewed Reid's medical records and her assessment was largely in line with Dr. McGan's physical RFC assessment.  R. 94-96. She made note of Reid's medical history, characterizing it largely as Dr. McGan had.  R. 96.  As to Reid's exertional limitations, she reached the same conclusions as Dr. McGan, but also noted as to push/pull limitations in her lower left extremities, further noted that they were "limited to occasional for foot control."  R. 96.

As to her postural limitations, Dr. Truong concluded that Reid can occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl, but that Reid could never climb ladders, ropes, or scaffolds.   R. 95.   She also concluded that Reid had no manipulative, visual or communicative limitations.   Id.   As to environmental limitations, Dr. Truong concluded that Reid should avoid concentrated exposure to extreme heat, extreme cold, wetness, humidity, fumes, odors, dusts, gases, poor ventilation and hazards.   R. 95-96.

### c)   Dr. Laxer's Physical RFC Assessment

On May 11, 2018, Reid's PCP, Dr. Laxer, completed a physical RFC assessment of Reid. R. 549-54.   As to exertional limitations, Dr. Laxer conclude that Reid could occasionally lift or carry up to ten pounds and could never lift or carry items more than eleven pounds, citing her chronic back pain and tenderness for this conclusion.   R. 549.   Dr. Laxer also found that Reid can generally sit, stand, or walk for thirty minutes at a time without interruption.   R. 550.   Dr. Laxer did not complete the assessment of how long Reid can sit, stand, or walk during an eight-hour workday.   Id.   Although she indicated that Reid used a cane, she noted that the use of same was not medically necessary.   Id.   Dr. Laxer noted manipulative limitations as to Reid's left and right hands such as, occasionally being able to reach overhead or otherwise, but noted that limitations as to handling, fingering, feeling or push/pull were "unknown" and noted they were "not evaluated—will need formal evaluation."   R. 551.   In terms of use of her feet, Dr. Laxer concluded that Reid could only occasionally use foot controls, but again made a notation of "not evaluated— will need formal evaluation.   Id.

As to Reid's postural limitations, Dr. Laxer concluded that Reid could occasionally climb stairs and ramps, but that she cannot climb ladders or scaffolds, balance, stoop, kneel, crouch or crawl.   R. 552.   She noted that none of these impairments affected Reid's hearing or vision.   Id.

As to environmental limitations, Dr. Laxer concluded that Reid could occasionally tolerate exposure to moving mechanical parts, operating a motor vehicle, humidity and wetness, but could never tolerate unprotected heights, dust, odors, fumes and pulmonary irritants, extreme cold, extreme heat and vibrations.  R. 553.  As support for same, Dr. Laxer cited Reid's asthma.  Id.

As to Reid's ability to perform activities of daily life,  Dr. Laxer concluded that Reid cannot "travel without a companion for assistance" or "walk a block at a reasonable pace on rough or uneven surfaces."  R. 554.  She further noted that Reid could take standard public transportation and climb a few steps at a reasonable pace with the use of a single hand rail, prepare a simple meal and feed herself, take care of her personal hygiene and handle paper/files.  Id.  Dr. Laxer also noted that Reid could move around without a cane, but used it as needed.  Id.

    *3.*  *Mental RFC Findings*

      a) Dr. Montgomery & Dr. Fischer's Mental RFC Findings

State psychologist Dr. Carol E. Montgomery reviewed Reid's medical records and assessed her mental RFC in August 2017.  R. 75-76.  One month later, another state psychologist, Dr. S. Fischer, did the same.  R. 96-97.  Both Dr. Montgomery and Dr. Fischer found that Reid did not have understanding and memory limitations.  R. 79; R. 96.  They concluded, however, that Reid had limitations with "sustained concentration and persistence."  Id.  They each noted that Reid was moderately limited in maintaining concentration for extended periods of time and conforming to workplace requirements such as, working within a schedule, maintaining regular attendance and punctuality and ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  R. 79; R. 96-97.  Both Dr. Montgomery and Dr. Fischer concluded that, despite Reid's limitations, she was capable of attending "for a two-hour period,

full work day and full work week," R. 80; R. 97, but "[m]otivational issues and reduced concentration may impact pace and persistence for complex tasks." Id.

Dr. Montgomery's conclusions relied upon Reid's "worsening depression" citing her "reduced motivation, reduced socialization and self care, [and] reduced concentration with a need for reminders." R. 76. Dr. Montgomery and Dr. Fischer both mentioned that Dr. Laxer opined that Reid's "medical issues, pain and financial stress have exacerbated her depression, but with continued treatment ha[d] a good prognosis." R. 76; R. 93.

4.      *The ALJ Hearing*

During the May 14, 2018 administrative hearing, the ALJ heard testimony from Reid and a vocational expert ("VE"), Albert J. Sabella. R. 36-67.

a)      Reid's Testimony

Reid testified that she worked as a payroll clerk, R. 45, but stopped working due to the constant pain she experienced from her impairments. R. 46. Reid reported that she had days where "she can't even put [her] feet on the floor" due to pain. Id. Reid said that she has pain in her neck, lower back into her left leg, that she has permanent nerve damage in her left leg and she experiences numbness in her fingers and left leg. R. 46-47. Previously, Reid underwent two back surgeries and a hip tendon debridement surgery. R. 48-49. She reported that she experiences increased pain on damp days, but the pain is "not nearly as bad as before" her hip surgery. R. 48. Reid reported that she had a pending consultation for another back surgery, but they are waiting on more imaging and testing before proceeding. R. 49- 50. Reid testified that she uses a leg brace "at home a few hours a day," R. 50, and uses a cane three to four times a week. R. 58. Reid also noted that she has a headache "pretty much every day" and experiences migraines two to three times a week. R.

48.  She reported drowsiness from two of her medications and noted that she takes two or three "cat naps" a day.  R. 49.

Reid noted that she was still being treated for bipolar disorder and anxiety and had seen an increase in her mental health issues over the past two years.  R. 50-51.  Reid shared that she experiences bouts of crying, anger and seeks to seclude herself from others.  R. 50.  Reid also reported that she suffered from a panic attack at least once a day "on a good day," had trouble breathing and that her "body starts shaking."  R. 51.  Reid also testified that she has difficulty with short term memory and sometimes needed instructions repeated.  R. 53.  When Reid was working, her boss noticed that she was "very angry and lashing out verbally at co-workers and crying consistently."  R. 51.

Reid could occasionally perform some household chores, such as cooking and cleaning, "in spurts."  R. 56.  She cleaned the house once a week including vacuuming, picking up "a little bit" and washing dishes.  Id.  She was able to grocery shop when she was with either her husband or one of her children.  R. 57.  Reid, however, did not engaged in other outside activities.  Id.

b)      VE's Testimony

The VE testified about Reid's past work as a payroll clerk and her most recent position as a general office clerk, describing these positions as semiskilled work with a medium activity level. R. 59.  The ALJ posed a series of hypothetical questions to the VE.  R. 59-63.  The ALJ asked if an individual, with Reid's age, education, work background who fit the following description: able to lift and carry twenty pounds occasionally, ten pounds frequently; could sit for six hours and stand and walk for four hours in an eight-hour work day, but had ability to alternate sitting and standing for five minutes each hour and such change would not render her off task; occasionally could push and pull left lower extremity controls and kneel, stoop, balance, crouch, crawl, climb

stairs and ramps, but could not climb ladders, ropes or scaffolding and would have to avoid concentrated exposure to extreme cold and heat, wetness, humidity, unprotected heights, dangerous machinery and fumes, odors, dust, gases and poorly ventilated areas; could perform simple, routine and repetitive tasks over the eight-hour work day with short breaks within a normal break schedule; and make simple work-related decisions, could perform Reid's past relevant work. R. 59-60. The VE confirmed that such individual could not perform Reid's past work because the semiskilled work extends beyond simple, routine tasks. R. 60. The VE noted, however, that there are jobs in the national economy with a light exertional level that the individual could perform such as, assembling electrical accessories, machine tending types of jobs and inspection types of work. R. 60-61.

In a second hypothetical, the ALJ asked the VE whether an individual, with the same age, education and work background as Reid but who met the following description: could lift and carry ten pounds occasionally, less than ten pounds frequently; could sit for six hours and stand or walk for two hours in an eight-hour day; could occasionally push or pull left foot controls; could never climb ladders, ropes or scaffolding, but occasionally could balance, stoop, kneel, crouch, crawl or climb stairs and ramps; could occasionally reach overhead bilaterally and frequently can finger and handle bilaterally; must avoid concentrated exposure to extreme cold and heat, wetness, unprotected heights, dangerous machinery, humidity and fumes, odors, dust, gases and poorly ventilated areas; could perform simple, routine, repetitive task over an eight-hour work day with short breaks about every two hours; could make simple work-related decisions; and could occasionally interact with supervisors, co-workers and the public and can tolerate simple routine changes in a work setting, could perform Reid's past relevant work. R. 61-62. The VE testified that this individual would also not be able to perform Reid's past work, but would be able to

perform sedentary work such as assembly or inspection type of work.  R. 62.  The ALJ then asked "if an individual is off task [fifteen] percent of a work day" would there be work available to them. R. 63.  The VE indicated that work would not be available as it would be considered unacceptable given industry standards to be off task fifteen percent of the workday.  Id.  Lastly, the ALJ asked the VE if such individual was absent two days a month on an ongoing basis, whether work would be available for this person and the VE responded that this would be "beyond any employer acceptability to industrial standard."  R. 63.

Reid's attorney asked the VE whether work would be available to "an individual who is limited to lifting up to [ten] pounds. . . who has to change position between sitting and standing every [thirty] minutes."  R. 63.  The VE acknowledged that the number of available jobs would be reduced, but that "there would [be] similar types of jobs that are described in hypothetical number two except the numbers would be reduced by about [fifteen] percent."  R. 63-64.  That is, available jobs as "assembler, the printed circuit board inspect[or] and the carding machine operator," but the numbers of such suitable jobs would be reduced by fifteen percent.  R. 64.

5.    *Findings of the ALJ*

Following the five-step process, 20 C.F.R. 404.1520(a), at step one, the ALJ found that Reid "has not engaged in substantial gainful activity since January 19, 2017."  R. 12.  At step two, the ALJ found that Reid has severe impairments, including lumbar spine degenerative disc disease, left hip internal derangement, depressive disorder and anxiety disorder.  R. 13.  The ALJ also noted that Reid has "a history of mild cervical spine degenerative disc disease, mild intermittent asthma, DVT and vestibular disorder," but that these disorders "have either resolved with minimal limiting residual symptoms or are amenable to proper control by adherence to recommended medical management and medication compliance."  R. 13.  At step three, the ALJ found that "the claimant

does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404 Subpart P, Appendix 1." Id. The ALJ considered the "paragraph B" criteria and determined that Reid had mild restrictions in her ability to understand, remember or apply information; interact with others and adapt or manage herself. R. 14. The ALJ also concluded that Reid had moderate restrictions in her ability to concentrate, persist or maintain pace. R. 14.

The ALJ found that Reid has the RFC capacity to perform light work as defined in CFR 20 § 404.1567(b) with certain, enumerated limitations, but concluded that Reid "can perform simple, routine and repetitive tasks over an eight-hour workday within a normal break schedule," and "she can make simple work-related decisions." R. 15. Accordingly, at step four, based upon this RFC, the ALJ found that Reid "is unable to perform any past relevant work." R. 22. At step five, the ALJ concluded that considering Reid's "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [she] can perform." R. 23-24.

### C.      Reid's Challenges to the ALJ's Findings

Reid seeks reversal of the ALJ's decision. D. 16. Reid contends that the ALJ's findings are not supported by substantial evidence from her entire medical record. D. 17 at 4. First, Reid argues that the ALJ erred in giving less weight to the findings of her PCP, Dr. Laxer, in determining her physical RFC. Id. Reid further asserts that the ALJ improperly relied upon the findings of state physicians who failed to address all of her physical impairments. D. 17 at 5. Second, Reid contends that "the ALJ failed to address the impact of the side effects" of her medications. D. 17 at 5. Third, Reid claims that the ALJ "did not account for the impact of all [her] impairments

throughout the claimed period of disability" and that she is "unable to perform work due to her severe medical impairments" and "extremely limited residual functional capacity."  D. 17 at 6.

"Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations."  Biestek v. Berryhill, __ U.S. __, 139 S. Ct. 1148, 1154 (2019) (quoting Consol. Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229 (1938)).  "Substantial evidence is 'more than a mere scintilla'" meaning that it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Id. (internal citations and quotation marks omitted).

### 1.     The ALJ Did Not Err in Giving Less Weight to Dr. Laxer's Findings

Reid argues that Dr. Laxer's findings were consistent with her medical record and thus the ALJ erred in giving less than controlling weight to the PCP's physical RFC findings. D. 17 at 4. If an ALJ does not give controlling weight to a treating source, the ALJ must use a "factors-based test that considers the length of the treatment relationship, nature and extent of the relationship with [the] applicant, whether the source provided evidence in support of the opinion, whether the opinion is consistent with the record as a whole, and whether the source specializes in the field." Guarente, 2017 WL 3621078, at *6 (citing 20 C.F.R. § 404.1527(c)).  The ALJ, however, "need not discuss each factor in his decision on the weight given to a treating physician's opinion if the ALJ provides good reasons supported by substantial evidence in the record."  Id.  The ALJ has done so here.  As discussed above, Dr. Laxer concluded that Reid can only occasionally lift or carry ten pounds, R. 549, and can sit, stand, or walk for only thirty minutes at a time.  R. 550.  Dr. Laxer also concluded that Reid had some manipulative, handling, and postural limitations, such as only occasionally being able to reach, but marked as "unknown" any other limitations with her hands since such were "not evaluated—will need formal evaluation."  R. 551.  Based on Dr.

Laxer's assessment of Reid's postural limitations, Reid could occasionally climb stairs and could never climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl.  R. 552.

An ALJ may assign controlling weight to the findings of treating physicians if they are "consistent with other substantial evidence in the claimant's record."  Guarente v. Berryhill, No. 16-CV-12003, 2017 WL 3621078, at *6 (D. Mass. Aug. 23, 2017) (citing 20 C.F.R. § 416.927(c)(2)).  Here, the ALJ noted that Dr. Laxer "not only provided an incomplete form, i.e., there is nothing to indicate for how long in 8-hour day, the claimant can walk, stand or sit," but that the PCP had also "posited excessive physical limitations given the evidence of record" that were inconsistent with Reid's own testimony about her ability to perform household chores and other activities.  R. 21; see Sanchez v. Colvin, 134 F. Supp. 3d 605, 616 n. 6 (D. Mass. 2015) (concluding that a claimant's activities of daily life can be considered as part of analysis of whether substantial evidence in the record supported the ALJ's decision).  Reid, however, argues that Dr. Laxer's conclusions are supported by the record because her medical records "from years of pain management indicate that her symptoms are worsened by bending, prolonged standing walking and other activity."  D. 17 at 4.

The ALJ's decision to give Dr. Laxer's physical RFC less than controlling weight, however, was still warranted in light of the entirety of the record here.  Although Reid points to evidence in the record as to her "antalgic gait, tender lumbar spine, positive left straight leg raise, decreased sensation in lower left extremity, pain with abduction and adduction, and decreased range of motion in the lumbar spine," D. 17 at 55; see e.g., R. 381, 490, to support Dr. Laxer's assessment, the ALJ highlighted diagnostic tests that showed "[s]table postsurgical changes of prior left L5-S1 hemilaminectomy; stable granulation tissue encasing the traversing S1 nerve root in the lateral and subarticular recess" and "no significant canal stenosis or neural foraminal

narrowing." R. 18; <u>see</u> R. 331. The medical record shows that Reid did "gain benefits from her back surgeries," R. 431, and had "a full range of motion (ROM) and no limitation" in her "lumbar spine, cervical spine, or in her bilateral upper and lower extremities." R. 18; <u>see</u> R. 348-350. Reid also recovered well from her hip debridement surgery. R. 18-19; <u>see</u> R. 339-340. The medical record, moreover, showed that Reid's pain was generally well-controlled by her medication. <u>See, e.g.</u>, R. 374, 378, 505.

The ALJ also reviewed Reid's daily activities, noting that Reid testified that she cleaned the house once a week including "vacuum[ing] a little bit" and " walk[ing] around and pick[ing] up a little bit." R. 56; <u>see</u> R. 22. Reid also stated that she was able to do laundry, but that she has trouble carrying the laundry once it is done. <u>Id.</u> Reid also attended her doctor's appointments and her husband's AA meetings often. R. 22, 190, 194. Lastly, the ALJ cited physical and neurological examinations showing that Reid had a normal gait, R. 18-19; R. 339, and normal strength and motor sensation. R. 351, 353.

Reid's argument that the ALJ improperly relied on the findings of the state physicians, D. 17 at 5, also is flawed because it is well-established that giving "substantial weight to the opinions of non-treating medical reviewers," is within the ALJ's discretion. <u>D.A. v. Colvin</u>, No.11-cv-40216-TSH, 2013 WL 5513952, at *7 (D. Mass. Sept. 30, 2013) (citing <u>Quintana v. Comm'r of Soc. Sec.</u>, 100 F. App'x 142, 144 (1st Cir. 2004); <u>DiVirgilio v. Apfel</u>, 21 F. Supp. 2d 76, 81 (D. Mass. Sept. 24, 1998).

The ALJ accorded "great weight to the opinions of the state medical and psychological consultants' assessments, at reconsideration" because "[t]hese opinions are supported, and are consistent with the overall evidence of the record, including [Reid's] treatment history, diagnostic tests, everyday activities, and her physical, neurological, and psychological examinations." R. 21.

Reid argues, however that the state physicians "failed to address the impact of [her] neck pain due to her mild spondylosis," her "physical examination findings relat[ed] to [her] lumbar spine and radicular symptoms, and her use of a brace on her left leg." D. 17 at 5.  Contrary to Reid's assertion, however, Dr. Truong did address her lumbar radicular condition, as she cited medical records that showed "bilateral moderate NF narrowing L 4-5 and radiculopathy to [the] [fourth] and [fifth] toes" and an August 2017 exam that "decreased ROM TTP over L/S area, + SLR L antalgic gait." R. 96.  While the state physicians did not address her mild spondylosis, the ALJ discussed this factor and considered it to be less significant in determining her ability to work. R. 13 (finding that Reid's mild cervical spine degenerative disc disease was "nonsevere").  This finding is supported by the record given that Reid's cervical spine showed "no acute fracture or dislocation." R. 332; see R. 434.  Lastly, while Reid's use of a leg brace was not specifically mentioned by the state physicians, the ALJ did acknowledge that Reid "uses a leg brace. . . as needed because she has a 'drop foot.'"  R. 16.  Reid's leg brace, moreover, is not a significant factor in determining her ability to work.  In October 2017, physician assistant Pierce noted that Reid "has been given a brace although she does not typically wear [it]."  R. 492.

Given that the ALJ provided a "rational explanation" for assigning greater weight to the opinions of non-treating physicians, the Court concludes that the ALJ did not err in relying upon them.  See D.A., 2013 WL 5513952 at *8.

### 2.  The ALJ Did Not Err in His Consideration of the Side Effects of Reid's Medication

Reid contends that the ALJ erred in his consideration of the side effects of her medication because she suffers from fatigue and the ALJ did not address the impact of her blood thinners, which prevent her from utilizing a pump for pain relief.  D. 17 at 5. Reid challenges the ALJ's

finding that the severity of her symptoms as described in her testimony and Dr. Laxer's RFC assessment were not completely credible.  Id.

"A fact-finder's assessment of a party's credibility, however, is given considerable deference and, accordingly a reviewing court will rarely disturb it." Ferreira v. Astrue, No. 10-cv-11983-NMG, 2012 WL 1085522, at *7 (D. Mass. Mar. 29, 2012) (citing Anderson v. Astrue, 682 F. Supp. 2d 89, 97 (D. Mass. 2010) (finding that if an ALJ's credibility determination is supported by the medical record it will not be disturbed by the court)).  "In assessing a claimant's symptoms, an ALJ must consider all of the claimant's statements about [her] symptoms, including [her] subjective allegations of pain and its effect on [her] daily life and ability to work." Anderson, 682 F. Supp. 2d at 97 (citing 20 C.F.R. § 404.1529(a)).  Statements regarding pain, however, "will not alone establish that you are disabled.  There must be objective medical evidence from an acceptable medical source that shows [ ] a medical impairment which could reasonably be expected to produce the pain . . . and that, when considered with all of the other evidence . . . would lead to a conclusion that [the claimant is] disabled."  20 C.F.R. § 404.1529(a).

Here, there is sufficient evidence in the medical record to support the ALJ's subjective symptom evaluation.  On several occasions, Reid denied any side effects from her medication.  For example, in March 2017, Reid went to a pain management appointment and "denie[d] side effects with current medication regimen."  R. 373; see, e.g., R. 373; R. 492; R. 496.  It also appears that when Reid experienced a side effect to a medication, she often discontinued taking it.  For example, in April 2017, after starting a trial of Pamelor, Reid reported that the morning dose caused "sedation," so she continued taking the prescribed dose at night only with "no sedation."  R. 376. By July 2017, Reid discontinued taking Pamelor due to "vision issues."  R. 379; R. 492.  In March 2018, Reid was prescribed a trial of Embeda for her back pain, R. 502, but by April 2018, she

reported that it caused "severe drowsiness" and balance/dizziness issues and she stopped taking it. R. 505.

The ALJ also considered Reid's daily activities and determined they "were not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." R. 21-22. Reid acknowledged that she was able to take care of her own personal needs, performing household chores, shopping for groceries and attending medical appointments. R. 56-57; R.191-194. While household chores do not equate the ability to work, "evidence of daily activities can support a negative credibility finding." Teixeira v. Astrue, 755 F. Supp. 2d 340, 347 (D. Mass. 2010).

Lastly, Reid argues that the ALJ erred by failing to address that Reid is precluded from other forms of pain management, specifically a pain pump for relief. D. 17 at 5. While the ALJ did not address that Reid cannot use a pump for relief, D. 17 at 5, the medical record reflects that Reid cannot use this form of treatment due to her history of pulmonary embolism and use of blood thinners. R. 347. Here, Reid has not demonstrated the significance of her inability to use a pain pump. An ALJ's failure to address an issue "is not sufficient grounds for remand where the claimant fails to develop the significance of same." Viveiros v. Astrue, No. 10-cv-11902-DJC, 2012 WL 4104794, at *12 (citing Lacroix v. Barnhart, 352 F. Supp. 2d 100, 115 (D. Mass. 2005)). This argument does not warrant reversal here, particularly given that there is evidence in the record that Reid effectively uses other medication and injections for pain management.

### 3. The ALJ Did Not Err in His Assessment of The Combined Effects of the Claimant's Impairments

Reid contends that the ALJ's physical RFC assessment did not include the combined effects of her impairments. D. 17 at 6. Reid argues that she is "limited in her ability to sit, stand, walk for more than [thirty] minutes and lift more than [ten] pounds" and that "[s]he relies on

medications and pain management."   D. 17 at 7.  Reid claims the combined effect of her impairments prevent her from "meet[ing] the physical and mental demands of basic work activities, including her past relevant work."  Id. at 6.

"SSA regulations and case law mandate that the ALJ consider the combined effect of a claimant's impairments at each step of the sequential analysis."  Snow v. Barnhart, No. 05-cv-11878-RGS, 2006 WL 3437400, at *6 (D. Mass. Nov. 29, 2006) (citing 20 C.F.R. § 404.1520(g)). "[T]he [ALJ] shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity" to merit consideration.   42 U.S.C. § 423(d)(2)(B).   Here, the ALJ "considered all [of Reid's] symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  R. 15.  At step four, the ALJ went through the individual listings for Reid's impairments and found that she did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  R. 13.  The ALJ then considered all of Reid's severe and non-severe physical and mental impairments.  R. 16-22.  Accordingly, the ALJ adequately considered Reid's combined impairments.  See Gaudet, 2012 WL 2589342, at *7 (citing Snow, 2006 WL 3437400, at *6) (holding that an ALJ's discussion of medical record can show adequate consideration of a claimant's combined impairments).

## V.   Conclusion

For the foregoing reasons, the Court DENIES Reid's motion to reverse and remand, D. 16, and ALLOWS the Commissioner's motion to Affirm, D. 18.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge